## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| **CHARTER COMMUNICATIONS** | ) | |
| **ENTERTAINMENT I, LLC d/b/a** | ) | |
| **CHARTER COMMUNICATIONS,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **04-40064-FDS** |
| | ) | |
| **INES CINTRON, Defendant.** | ) | |
| _____) | | |
| _____ | ) | |
| **CHARTER COMMUNICATIONS** | ) | |
| **ENTERTAINMENT I, LLC d/b/a** | ) | |
| **CHARTER COMMUNICATIONS,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **04-40081-FDS** |
| | ) | |
| **DENNIS SOSA, Defendant.** | ) | |
| _____) | | |
| _____ | ) | |
| **CHARTER COMMUNICATIONS** | ) | |
| **ENTERTAINMENT I, LLC d/b/a** | ) | |
| **CHARTER COMMUNICATIONS,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **04-40098-FDS** |
| | ) | |
| **THOMAS A/K/A TOM BURDULIS,** | ) | |
| **Defendant.** | ) | |
| _____) | | |

## MEMORANDUM ON PLAINTIFF'S MOTIONS FOR DEFAULT JUDGMENT

**SAYLOR, J.**

The above-captioned cases involve virtually identical allegations of cable television piracy.

The cable operator, Charter Communications, has filed separate actions against three individuals,

all of whom are alleged to have purchased unauthorized devices to defeat scrambling or security

measures and thereby obtain premium cable television services for free.  In each case, Charter has obtained an entry of default and has moved for a default judgment.

The issue in these cases is not the propriety of entering a judgment of default, but rather ascertaining the amount of damages to be assessed against the defaulting defendants.  There are multiple levels of analysis that must be undertaken to accomplish that seemingly simple task.  First, the Court must determine whether Charter is entitled to recover under not only 47 U.S.C. § 553, which applies to the theft of "cable" transmissions, but also 47 U.S.C. § 605, which applies to the theft of "radio" transmissions.  The issue is not merely academic, as the latter statute provides for greater potential recovery of damages and recovery of costs and attorneys' fees as of right.  The Court must then consider the amount of compensatory damages (either statutory or actual) to be awarded and the extent to which enhanced damages, attorneys' fees, costs, and injunctive relief should be awarded.  To complicate matters further, the courts are in substantial disagreement as to many of the basic principles governing the resolution of those questions.

For the reasons set forth below, the Court concludes that § 553 applies to these cases, but not § 605; that any statutory damages should be a reasonable estimate of plaintiff's actual damages and should not include any component for punishment or deterrence; that the act of purchasing and installing a descrambling device is ordinarily sufficient to demonstrate "willful" conduct subject to enhanced damages; and that the use of a descrambler for home viewing of cable television programs is ordinarily sufficient to demonstrate that the act was committed for purposes of "private financial gain."  The Court also finds that plaintiff is entitled to injunctive relief and an award of costs and reasonable attorneys' fees in each case.

## I. <u>Background</u>

The following facts are taken as true.[1]  Charter is a cable operator that provides cable services to its customers.  Compl. ¶ 7.  Charter customers pay a monthly fee depending upon the level of service and amount of programming they select and purchase.  Compl. ¶ 9.  At all relevant times, Charter has offered basic cable channels, premium channels, such as Home Box Office, Cinemax, and Showtime, and pay-per-view channels for movies and special events.  Compl. ¶ 11. Subscribers pay fixed monthly fees for access to basic cable channels and premium channels, and pay one-time charges for access to pay-per-view selections, which vary according to the particular program selected.  Compl. ¶¶ 9, 18.

Although the complaints do not so specifically state, it appears that Charter receives radio signals sent via satellites by broadcasters and converts them into cable signals for delivery to subscribers.  *See, e.g., United States v. Norris*, 88 F.3d 462, 467 (7th Cir. 1996).  The cable signals are typically delivered by a coaxial cable directly to the subscriber's home.  *Id.*

Charter's cable signals for premium channels and pay-per-view services are electronically coded or scrambled so that they must be decoded by electronic decoding equipment for the signals to be viewed clearly on a television receiver or monitor.  Compl. ¶ 12.  To decode the signals, Charter provides subscribers of these services with electronic decoding equipment referred to as converters.  Compl. ¶ 13.  Charter's converters are programmed from a central location to decode

---

[1] Because the defendants here all have been defaulted for failure to plead or otherwise defend, they are "taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated."  *Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 62-63 (1st Cir. 2002) (quoting *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 n.3 (1st Cir. 1999)).  Before entering the default judgments, the Court may examine the complaints, taking all well-pleaded factual allegations as true, to determine their legal sufficiency.  *Ramos-Falcon v. Autoridad de Energia Electrica*, 301 F.3d 1, 2 (1st Cir. 2002); *Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15, 16 (1st Cir. 1992).  For the sake of convenience, and unless otherwise noted, the Court will cite only to the Cintron complaint.  The other complaints do not differ in material respects except where noted.

the signals and thereby enable the subscriber to view the purchased level of service.  Compl. ¶ 14.

Charter programs each of its converters specifically to permit the subscriber to view only the level

of service purchased.  *Id.*

To receive pay-per-view service, the subscriber's converter box must be addressable.

Compl. ¶ 16.  The subscriber either telephones Charter and requests to view the specific movie or

event or orders that movie or event using a remote control device.  Compl. ¶ 17.  Charter then

programs the addressable converter box to descramble that movie or event, enabling the subscriber

to receive a nonscrambled signal during the time of the broadcast.  *Id.*  The price of pay-per-view

movies or events varies but ranges from $3.95 for certain movies to approximately $49.95 for

certain sporting or other special events.  Compl. ¶ 18.  Charter subscribers are billed monthly for

pay-per-view movies and events ordered during the previous month.  *Id.*

Unauthorized decoders or descramblers are devices that have been designed or modified to

defeat the scrambling or addressable security functions of Charter's cable system.  Compl. ¶ 19.

Ordinarily, a person seeking to steal cable television signals will purchase the most basic service

available and use the illegal device to access premium services and pay-per-view movies and

events.  *See* Compl. ¶ 9.

In connection with *AT&T Broadband v. Modern Electronics*, *Inc.*, 8:03-00430 (D. Neb.

Sept. 17, 2002), Charter obtained business records of an entity called Modern Electronics.  Compl.

¶ 20.  Those business records indicate that each defendant here ordered and purchased from

Modern Electronics a cable theft device designed to effect the unauthorized reception of cable

programming.  Compl. ¶ 21.  Each defendant had also ordered only a particular level of service

from Charter for the relevant time period.  Compl. ¶ 8.

None of the defendants in the three cases answered or otherwise responded to the complaint. The clerk has entered a default in each case.

## II. Legal Analysis

### A. The Applicability of Sections 553 and 605

Charter contends that it is entitled to recover damages under both 47 U.S.C. § 553 and 47 U.S.C. § 605.[2] Although §§ 553 and 605 are similar in many respects, § 605 provides for a greater potential recovery of damages than § 553. Moreover, an award of costs and attorneys' fees is mandated for a violation of § 605, but such an award is discretionary as to a violation of § 553. Because any award of damages in this case will depend upon which provision of Title 47 applies, this Court must examine the applicability of both § 553 and § 605.

Section 553 provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1). There is no question that defendants' conduct subjects them to liability under § 553.

Section 605 provides that "[n]o person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a). Section 605 thus prohibits the unauthorized interception or

---

[2] Specifically, each motion for default judgment seeks the following relief: statutory damages in the amount of $20,000 for violations of 47 U.S.C. §§ 553(a) and 605(a); an order enjoining the defendant from "engaging in, aiding, abetting or otherwise promoting or supporting interception or reception of the cable television programming, service or signal of Charter"; and attorneys' fees and costs in the amount specified in an attached affidavit.

reception of *radio* communications. Although Charter does not explain why defendants'

interception or reception of Charter *cable* transmissions violated § 605, cable operators in other

cases have theorized, as set forth below, that § 605 applies to such actions because the intercepted

cable transmissions previously had been transmitted to the cable operator via radio from satellites.

*See, e.g.*, *International Cablevision, Inc. v. Sykes*, 75 F.3d 123 (2d Cir. 1996) [*Sykes II*].

   The First Circuit has not yet decided whether theft of cable services transmitted via wire

violates § 605, and the Courts of Appeals that have examined the issue are split. *Compare Sykes*

*II*, 75 F.3d at 133 (concluding that unauthorized interception of cable transmissions violates both

§§ 553 and 605), *with Norris*, 88 F.3d at 469 (holding that theft of cable services does not violate

§ 605), *and TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196, 197 (3d Cir. 2001) (same).

   Reported decisions from District Courts in this circuit reveal a similar split. *Compare*

*Century ML-Cable Corp. v. Diaz*, 39 F. Supp. 2d 121, 123-24 (D.P.R. 1999) (stating that both

§ 553 and § 605 prohibit the sale of illegal cable theft devices), *and United States v. Beale,* 681 F.

Supp. 74 (D. Me. 1988) (same), *with Kingvision Pay-Per-View, Ltd. v. Rocca*, 181 F. Supp. 2d 29

(D.N.H. 2002) (concluding that § 605 does not encompass cable theft), *and TCI Cablevision of*

*New Eng. v. Pier House Inn, Inc.*, 930 F. Supp. 727, 734 (D.R.I. 1996) (same).

   For the reasons discussed below, the Court concludes that the defendants' actions do not

violate § 605. The Court first will analyze the language and history of § 605 and then will examine

the reasoning of the courts in *Sykes II*, *Norris*, and *TKR Cable*.

   "[T]he starting point for interpreting a statute is the language of the statute itself."

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980); *accord Arnold*

*v. United Parcel Serv., Inc.*, 136 F.3d 854, 857 (1st Cir. 1998). As noted, Section 605 applies to

the interception of "any interstate or foreign communication by radio." 47 U.S.C. § 605(a).  The

term "communication by radio" is defined under the statute to mean the "transmission by radio of .

. . signals . . . of all kinds . . . ." 47 U.S.C. § 153(33).[3]  Section 605 does not, however, refer to

the interception of a "communication by wire," which is also a defined term.  Section 153(52)

provides that "communication by wire" means transmission of "signals . . . of all kinds . . . by aid

of wire, cable, or other like connection."[4]  It thus seems obvious that § 605 was intended to apply

only to the interception of *radio* communications and not to the interception of *wire*

communications, which is defined to include *cable* transmissions.

    If this were a case of first impression, the Court would simply conclude that the language

of § 605 does not apply to the theft of cable services, without further inquiry.  *See Arnold*, 136

F.3d at 858 (observing that a district court need not consult other interpretive sources where a

statute's plain meaning is clear).  Nevertheless, this Court is not writing on a clean slate, and, as

---

[3] The full definition is as follows:

> The term "radio communication" or "communication by radio" means the transmission by radio
> of writings, signs, signals, pictures, and sounds of all kinds, including all instrumentalities,
> facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of
> communications) incidental to such transmission.

47 U.S.C. § 153(33).

[4] The full definition is as follows:

> The term "wire communication" or "communication by wire" means the transmission of writing,
> signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection
> between the points of origin and reception of such transmission, including all instrumentalities,
> facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of
> communications) incidental to such transmission.

47 U.S.C. § 153(52).

the courts that previously have considered the issue are split, the Court will address the issue in greater detail.

From the very onset of government regulation of radio broadcasting, Congress has drawn a clear distinction between radio transmissions and wire transmissions. *See Norris*, 88 F.3d at 464. The Communications Act of 1934, ch. 652, 48 Stat. 1064, now codified in relevant part at 47 U.S.C. § 605(a), established the Federal Communications Commission and granted the newly created commission jurisdiction over wire and radio transmissions. *Id.* at 464-65. In 1968, Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968 (Crime Control Act) to regulate the interception of wire and oral communications. Pub. L. No. 90-351, 82 Stat. 197. The Crime Control Act amended § 605, removing all references to wire communications except the first clause of § 605(a), which prohibited telecommunications personnel from publishing or divulging wire and radio transmissions. *Norris*, 88 F.3d at 465. After that amendment, § 605 generally continued to apply to "radio transmission[s]." *Id.*

The adoption of the Crime Control Act left a regulatory gap whereby theft of cable services, which involved a form of wire interception, was not explicitly covered in any statute or regulatory scheme. *Id.* To fill the gap, Congress eventually enacted 47 U.S.C. § 553(a) as part of the Cable Communications Policy Act of 1984, Pub. L. No. 98549, § 2, 98 Stat. 2779, 2796. *Id.* Section 553(a)(1) expressly prohibits the interception or unauthorized reception of "any communications service offered over a cable system."

That evolution of the statutory scheme reinforces the conclusion that is apparent from the text of the statute: Congress intended §§ 553 and 605 to address different types of interceptions. Nevertheless, the courts do not unanimously concur with that interpretation.

8

In *Sykes II*, the Second Circuit, the first Court of Appeals to face the question, held that distributors of cable theft devices are liable under both § 553 and § 605. The court reasoned that the devices ultimately are used to intercept radio communication, even if the radio communication is transmitted by cable at the point of interception. 75 F.3d at 131. The court acknowledged that Congress amended § 605 in 1968 to remove all references to wire communications and that this legislative action could be read as eliminating the applicability of § 605 to cable-television theft. *Id.* at 130. Nevertheless, the court rejected such an interpretation, relying on pre-1984 decisions applying § 605 to cable theft and a passage of the legislative history the court interpreted as adopting the reasoning of those decisions.

As the court in *Sykes II* observed, several District Court cases decided before the enactment of § 553 in 1984 had interpreted § 605 as affording protection to television signals transmitted via coaxial cable. 75 F.3d at 130-32 (describing such cases). These cases, the court stated, provided a "plausible interpretation" of the [pertinent portion] of § 605: "[t]he continued transmission of radio signals via cable after their receipt at the headend of a cable television system can be regarded as the 'receipt, forwarding, and delivery of [radio] communications . . . incidental to [the transmission]' of those communications within the meaning of § 153(b)." *Id.* at 131 (citing *Cablevision v. Annasonic Elec. Supply*, No. CV-83-5159 (E.D.N.Y. Feb. 10, 1984), *incorporated in Ciminelli v. Cablevision*, 583 F. Supp. 158, 164 (E.D.N.Y. 1984)).[5] As Congress is presumed

---

[5] One commentator casts doubt on these pre-1984 decisions as "probably making a virtue out of a necessity, as Section 605 had been drafted to cover over-the-air communications and did not address the particular issue of cable transmission." Daniel L. Brenner et al., *Cable Television and Other Nonbroadcast Video* § 5:84 (2004); *see also Norris*, 88 F.3d at 468 (describing the pre-1984 cases as attempts to "judicially fill the gap created by the [Crime Control Act] by extending § 605(a) to cover the interception of cable programming over a cable network"); *Pier House Inn*, 930 F. Supp. at 736 (questioning whether Congress should be deemed to have adopted the reasoning of the District Court cases cited in *Sykes II* because "[a] close reading of [those] cases . . . reveals that the issues raised varied in several important respects from those raised in both *Sykes II* and in this case.")

to have been aware of the District Courts' interpretation of § 605(a) and reenacted the statute without change, the court concluded that their interpretation may be deemed to have been adopted by Congress. *Id.*

The *Sykes II* court found this interpretation to be "strongly fortified" by a portion of the legislative history of § 553:

> [S]ection 605 of the Communications Act of 1934 includes a prohibition against the unauthorized reception of communications services. *Nothing in [§ 553] is intended to affect the applicability of existing Section 605 to theft of cable service, or any other remedies available under existing law for theft of service.* . . . [S]ituations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, *continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.*

*Id.* at 131-32 (quoting H.R.Rep. No. 934 at 83, *reprinted in* 1984 U.S.C.C.A.N. 4720 (emphasis added)). The court concluded that (1) the first emphasized passage indicated that § 605 would continue to apply to cable theft; and (2) the second emphasized passage established the exclusive applicability of § 605 to the interception of radio signals before they are retransmitted over a cable network but did not bar the section's application to cable theft. *Id.* at 132.

Just months after the opinion in *Sykes II*, the Seventh Circuit reached an opposite result, holding that cable-television programming transmitted over a cable network is *not* a radio communication actionable under § 605. *Norris*, 88 F.3d at 469.[6] The government offered two arguments as to why cable transmissions are "radio" communications: (1) because wire

---

[6] Although *Norris* was a criminal prosecution rather than a civil lawsuit, the applicable statutory language and analysis are the same in both contexts.

transmissions technically are radio waves delivered through a conducting cable, and (2) because a cable company's reception and forwarding of programming received as radio transmissions onto its cable network are "merely incidental" to the original radio transmissions. *Id.* at 467. The *Norris* court rejected both arguments. As to the former, the court stated that the argument "impermissibly conflates the definitions of wire and radio communications under Title 47— definitions which for over eighty years Congress has treated as distinct and mutually exclusive." *Id.* at 467. As to the latter, the court similarly noted that if it accepted the government's position, it would "unacceptably blur[]" the line between radio and wire communications. *Id.* at 467-68.[7] The *Norris* court also noted that the government's position would render much of the regulatory scheme "meaningless." *Id.* at 468.

After examining the statutory meaning of "wire" and "radio" communications, the court in *Norris* considered Congress's intent in enacting § 553. *Id.* at 468. The court reasoned that if Congress intended § 605 to cover the theft of satellite- and radio-originated cable transmissions, the only additional conduct covered by § 553 would be the theft of local cable programming that originates from the cable provider. *Id.* The court determined that, more logically, § 605 was meant to cover interceptions of programming traveling through the air, and § 553 was meant to cover interceptions of programming traveling over cable wire. *Id.* Finally, the *Norris* court concluded that the court in *Sykes II* had misinterpreted the legislative history of § 553 by taking passages out of context and assigning to them meanings at odds with the section's purpose. *Id.*

---

[7] The court also noted that cable companies not only route the radio and satellite transmissions over their cable networks but also combine the various transmissions, sort them into channels, and retransmit them over their own networks, actions that cannot be considered to be merely incidental to the original transmissions. *Id.*

Five years after *Norris*, the Third Circuit also held that § 605 does not apply to cable theft because it does not involve the interception of radio communications. *TKR Cable,* 267 F.3d at 197. In particular, the court agreed with the Seventh Circuit in *Norris* that if § 605 applied to all communications that were at one point transmitted via radio waves, Congress's excision of wire communication from § 605 in 1968 would be meaningless. *Id.* at 202.

The court in *TKR Cable* found support for its decision in the legislative history of § 553. *Id.* at 203. First, the impetus behind the creation of § 553 was the economic impact of the then-novel phenomenon of cable piracy. *Id.* Second, Congress knew when it enacted § 553 that much cable programming is delivered via satellite, and, therefore, it would not have engaged in extensive discussion of the large and economically significant problem of cable piracy if § 605 already addressed it (and if § 553 was meant to apply to local cable programming only). *Id.* at 205.[8]

The Court finds the reasoning of *Norris* and *TKR Cable* to be persuasive, and accordingly concludes that § 605 does not apply to theft of cable programming by a subscriber using a descrambler device. That conclusion is substantially more faithful to the statutory text, which distinguishes "service offered over a cable system," § 553(a), from "communication by radio," § 605(a). As both courts observed, if both § 553 and § 605 apply to theft of cable programming, the only additional conduct covered by § 553 is the theft of local cable programming; it seems extremely unlikely that Congress intended the statute to cover such a narrow range of conduct. Although legislative history should be considered with great caution, here the evidence is

---

[8] The authors of a cable treatise agree with *Norris* and *TKR Cable* that "[s]ection 605 should be read to govern when the piracy involves air-borne signals, including those on their way for retransmission by a cable operator . . . once the signals have been received at the head-end, though, any later theft should only involve Section 633 [47 U.S.C. § 553]." Brenner et al., *supra*.

overwhelming that Congress intended § 553 to address the serious, widespread problem of cable piracy, not a microscopically small range of conduct.

That interpretation also comports with logic and common sense. Unless the words are completely disconnected from their ordinary meanings, a radio communication is simply not the same thing as a cable communication, even though an electrical engineer might say that a cable signal technically contains radio waves. The change in the mode of transmission, by cable instead of through the air, changes the applicability of the relevant statute.

For the reasons stated above, the Court concludes that § 605 does not apply to the theft of communications transmissions over a cable wire.

**B.     Compensatory Damages**

**1.     Methodology for Determining Statutory Damages**

Having concluded that Charter may proceed only under 47 U.S.C. § 553, the Court next must determine the amount of damages to which Charter is entitled in each case.

Section 553 permits the Court to award, among other things, either actual damages or statutory damages to a successful plaintiff. In relevant part, the section provides:

> Damages awarded by any court under this section shall be computed in accordance with either of the following clauses:
>
> (i) the party aggrieved may recover the actual damages suffered by him . . . or
>
> (ii) the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,0000 as the court considers just.

47 U.S.C. § 553(c)(3)(A).  The statute provides no guidance as to the determination of statutory damages, leaving the matter to the Court's discretion.  Charter seeks statutory damages in the amount of $10,000, the maximum permissible, for each defendant's violation of § 553.

In *Comcast of Massachusetts I, Inc. v. Naranjo*, Judge Keeton of this District addressed the problem of how to calculate statutory damages under § 553 in a case involving cable piracy for private home use.  303 F. Supp. 2d 43 (D. Mass. 2004).  The cable provider had encouraged the court to consider a number of factors in calculating statutory damages, including "the willfulness of defendant's violation, the importance of 'general and specific' deterrence, defendant's cooperation with plaintiff, and actual damages in determining the appropriate award of statutory damages."  *Id.* at 47.  The court, however, rejected Comcast's factor-based analysis, concluding that statutory damages should be "as reasonable an estimate of actual damages as the facts . . . allow," not greater.  *Id.*

The court observed that the plain language of § 553 provides that actual damages and statutory damages are "coordinate alternatives," with no difference or preference between them. *Id.*  It also noted that the deterrent effect plaintiff sought to build into statutory damages actually was served by other subsections of § 553, which provide enhanced damages for willfulness and an injunction to prevent future violations.  *Id.* at 48-49.  Finally, the court explained that to build deterrence damages into statutory damages would lead to an absurd result:

> Under plaintiff's theory, an aggrieved party may receive as
> statutory damages premiums to deter future conduct in addition to
> actual or estimated actual damages.  Statutory damages, however,
> may not exceed $10,000.  As a result, parties that have suffered
> large actual damages (greater than $10,000) cannot receive
> deterrence premiums.  But if any violators require an additional
> deterrence premium, it is those who have caused the largest
> amounts of harm.

*Id.* at 49.  Accordingly, the court concluded that it should award as statutory damages as reasonable an estimate of actual damages as the facts would allow.  *Id.*

To arrive at that estimate, the court took the monthly charge for the premium cable service defendant was receiving illegally and subtracted from it the amount defendant paid for basic cable service.  The court then considered the cost of pay-per-view programming.  It observed:

> Plaintiff offers no reasonable estimate of damages, stating only that the cost of all services could total over $500 a month.  But no defendant could partake of all the cable services made available by the illegal descrambler, nor do I find it plausible that a defendant would order pay-per-view services 24 hours a day, every day of the month.

*Id.*  Independently, then, the court determined that ten pay-per-view movies and four "additional pay-per-view selections" per month were reasonable and added the cost of these services to arrive at a total estimated monthly figure.[9]  Finally, it multiplied by the number of months cable was intercepted to arrive at a statutory damage amount of $2,780.  *Id.*

The approach used by other courts has varied widely.  Some courts have used statutory damages to approximate actual damages, as in *Naranjo*, but also included additional sums to deter future violations, the approach that *Naranjo* rejected.  *See, e.g.*, *Rosa*, 2002 WL 1446942, at *5 (opining that damages should be calculated to deter future misconduct and to avoid granting defendants a windfall); *Joe Hand Promos., Inc. v. Salinetti*, 148 F. Supp. 2d 119, 120-23 (D. Mass. 2001) (multiplying approximate actual damages by five to reach statutory damages, reasoning that the defendants should pay more than just restitution costs); *Mountain Cable Co. v.*

---

[9] Compare *Cablevision Systems New York City Corp. v. Rosa*, where the court concluded that one special event and seven pay-per-view movies per month were reasonable given the "limitations that taste, viewing preference, programming selection and time placed on [defendant's] viewing."  2002 WL 1446942, at *5 (S.D.N.Y. 2002).  The court acknowledged that any estimate of the value of the pay-per-view programming that defendant intercepted would be somewhat arbitrary.  *Id.*

*Choquette,* 53 F. Supp. 2d 107, 112 (D. Mass. 1999) (awarding $3,000 in statutory damages where a landlord distributed illegally intercepted cable to two apartment units and his own residence, noting that the sum reflected the "seriousness of defendant's violation balanced against the relatively small scale of his illegal activity").

Other courts have awarded a flat sum rather than attempting to approximate actual damages. Some courts have awarded the statutory maximum where the defendants have defaulted, failed to contest damages, showed willful conduct, or stole services valued near the maximum damage award. *See, e.g.*, *Community Television Sys., Inc. v. Caruso*, 134 F. Supp. 2d 455, 460-01 (D. Conn. 2000) (awarding $10,000, the maximum damages under § 605, where defendant made it as difficult as possible for the plaintiff to vindicate its rights); *Cablevision Sys. N.Y. City Corp. v. Lokshin*, 980 F. Supp. 107, 113 (E.D.N.Y. 1997) (awarding the maximum damages of $10,000 because plaintiff's reasonable estimate of the value of programming defendant received over six years was $9,000).[10]

Some courts have decreased damage awards when the defendant cooperated by surrendering unauthorized devices. *See Charter Communications Entm't I, LLC v. Shaw,* 163 F. Supp. 2d 121, 125 (D. Conn. 2001). Some have decreased awards on the grounds that the defendant's offense was considered minor. *See Kingvision Pay-Per-View v. Langthorne,* 2001 WL 1609366, at *1 (D. Mass. 2001) (awarding the statutory minimum in "a case involving a single unauthorized broadcast . . . by one small establishment that did not even charge its patrons a

---

[10] Still other courts have awarded flat sums without revealing their reasoning. *See*, *e.g.*, *Diaz*, 39 F. Supp. 2d at 125 (stating that $10,000, the maximum damages under § 553 and the minimum under § 605, for each of 750 violations, was a "just figure"); *Pier House Inn*, 930 F. Supp. at 737 (awarding $5,000 in statutory damages for a violation of § 553); *Cablevision Sys. Corp. v. Muneyyirci*, 876 F. Supp. 415 (E.D.N.Y. 1994) (awarding the statutory minimum per sale for 390 violations).

cover"); *Time Warner Cable of N.Y. City v. Barnes*, 13 F. Supp. 2d 543, 548 (S.D.N.Y. 1998) (awarding the statutory minimum of $1,000 when the defendant purchased a single cable theft device); *Time Warner Cable of N.Y. City v. Olmo*, 977 F. Supp. 585 (S.D.N.Y. 1997) (awarding the statutory minimum for each sale where the defendant sold only two cable theft devices).

This Court is persuaded that Judge Keeton's approach in *Naranjo* best satisfies the command of the statute and the judicial interest in promoting predictability and transparency. As Judge Keeton observed, statutory damages should be a reasonable estimate of actual damages; any deterrent effect should be created through an award of enhanced damages and attorneys' fees, not by inflating compensatory damages. The Court will therefore apply the approximation method rather than the flat-sum method, and limit statutory damages to a reasonable approximation of actual damages without a deterrence premium.

There remains the troublesome question of where to set the statutory damage amount. As in *Naranjo*, Charter has estimated its actual damages by claiming the amount of pay-per-view service defendants potentially *could* watch, rather than the amount a reasonable or average viewer, even one receiving service for free, *would* watch. Even in an era where the number of hours spent by the average American watching television has reached staggering proportions, there are, nonetheless, practical limits. Those who steal cable television presumably must sleep, eat, bathe, go to work, shop, and otherwise go about their daily lives. When they watch television, some of the time they presumably spend watching basic cable (for which they have paid) and premium cable (which they are stealing, but which is sold at a fixed monthly price). It is only, then, the amount of the additional stolen pay-per-view signals that the Court must attempt to estimate.

Charter has not submitted any evidence to assist the Court in this determination—for example, evidence, expert or otherwise, as to the viewership habits of the average cable subscriber or the average pay-per-view subscriber, or as to the impact on pay-per-view usage when the service is provided for free. The Court is thus left to estimate such viewership without any guideposts, or even a base point from which to begin. In the absence of such evidence, the Court will simply adopt the assumptions of Judge Keeton: the Court finds that ten pay-per-view movies at standard rates and four "additional pay-per-view selections" at higher rates per month is a reasonable estimate. It will therefore add the cost of these services to arrive at a total estimated monthly figure.[11] In addition to appearing to be plausible on its face, that approach has the virtue of consistency between two sessions of the same court. Should Charter, in a future case, come forward with evidence suggesting that the figure is too low or too high, the Court may revise its estimate accordingly.

2.     **Amount of Statutory Damages**

a.     **Cintron**

Charter seeks damages against Cintron for a 51-month period dating from April 2000 to July 2004.[12] Charter alleges that the cost of illegally intercepted premium programming for that

---

[11] According to Charter, standard pay-per-view movies cost $3.99; adult pay-per-view movies cost $6.99; and the company occasionally airs special pay-per-view events at prices between $5.95 and $59.95. Judge Keeton awarded Comcast damages for four "additional pay-per-view selections" at the adult-movie price, without distinguishing between adult movies and special events or estimating a separate number of pay-per-view special events. *See Naranjo*, 303 F. Supp. 2d at 49. That result is somewhat arbitrary, but reasonable in light of the fact that Charter, which has the burden or proving its damages, has not provided any information about the price, frequency, or viewership of special events actually made available during the relevant time period.

[12] Charter seeks damages from Cintron for the period April 2000 through July 2004, which is either 50, 51, or 52 months, depending upon the starting and ending dates of the calculation. Although Charter describes that period variously as "approximately four years and three months [i.e., 51 months]" and as "50 months," the Court has treated it as 51 months.

period was $40 per month ($10 each for The Movie Channel, Showtime, HBO, and Cinemax), for a total of $2,000 for the entire period. Additionally, as explained above, Charter will be awarded damages for ten pay-per-view movies per month at $3.99 each and four additional pay-per-view movies per month at $6.99 each, for a total of $3,393 in illegally intercepted pay-per-view programming for the entire 50-month period. Therefore, Cintron will be ordered to pay $5,393 in statutory damages.

### b.    Sosa

Charter seeks damages against Sosa for a 48-month period dating from August 2000 to August 2004. Charter alleges that the cost of illegally intercepted premium programming for that period was $40 per month ($10 each for The Movie Channel, Showtime, HBO, and Cinemax), for a total of $1,920 for the entire period. Additionally, as explained above, Charter will be awarded damages for ten pay-per-view movies per month at $3.99 each and four additional pay-per-view movies per month at $6.99 each, for a total of $3,257.28 in illegally intercepted pay-per-view programming for the entire 48-month period. Therefore, Sosa will be ordered to pay $5,177.28 in statutory damages.

### c.    Burdulis

Charter seeks damages against Burdulis for a 48-month period dating from August 2000 to August 2004. Charter alleges that the cost of illegally intercepted premium programming for that period was $40 per month ($10 each for The Movie Channel, Showtime, HBO, and Cinemax), for a total of $1,920 for the entire period. Additionally, as explained above, Charter will be awarded damages for ten pay-per-view movies per month at $3.99 each and four additional pay-per-view movies per month at $6.99 each, for a total of $3,257.28 in illegally intercepted pay-per-view

programming for the entire 48-month period.  Therefore, Burdulis will be ordered to pay $5,177.28 in statutory damages.

### C.    **Enhanced Damages**

In addition to compensatory damages, Charter seeks enhanced damages under the statute. Section 553(c)(3)(B) provides for enhanced damages of up to an additional $50,000 where the "court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain."  Two findings—willfulness *and* either commercial advantage or private financial gain—are thus required.

### 1.    **Willfulness**

The term "willful" is not defined in the statute.  It has been defined in the context of alleged Cable Act violations as "a disregard for the governing statute and an indifference to its requirements."  *Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851 (11th Cir. 1990).

Courts generally have been imprecise in assessing willfulness, often assuming it rather than finding it in any reasoned way.  This tendency may be due to the nature of the violation:  even garden-variety cable piracy (i.e., purchasing and hooking up an unauthorized device) could be considered willful because it requires affirmative illegal steps to be taken.  As one court noted, "Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems."  *Time Warner Cable of N.Y. City v. Googies Luncheonette, Inc.*, 77 F. Supp. 2d 485, 490-91 (S.D.N.Y. 1999), *quoted in Salinetti*, 148 F. Supp. 2d at 123.[13]  The Court agrees

---

[13] *See also King Vision Pay-Per-View Corp., Ltd. v. Tardes Calenas Moscoro, Inc.*, 2004 WL 473306, at *4 (S.D.N.Y. 2004) ("In order for [defendant] to access the telecast, it would have been necessary to use an unauthorized decoder, to make misrepresentations identifying [defendant] as a residential customer, or to illegally

that, in the ordinary case, the act of acquiring and installing a descrambling device is sufficient to

demonstrate a willful violation. But there nonetheless must be a distinction between willful and

non-willful violations, or the term "willful" has no meaning.[14]

Some courts have gone further and concluded that defendant's default in the litigation is

itself evidence of willfulness. *See, e.g., Salinetti*, 148 F. Supp. 2d at 122 (citing *Olmo*, 977 F.

Supp at 589 ("[T]he court may draw an inference of wilfulness from a defendant's failure to appear

and defend an action in which the plaintiff demands increased statutory damages based on

allegations of willful conduct.")); *see also Rosa*, 2002 WL 1446942, at *5 (concluding defendant's

default, among other things, demonstrated a willful disregard for the Cable Act); *Diaz*, 39 F. Supp.

2d at 125 ("[D]efendant's civil contempt and default alone may be viewed as evidence of

willfulness."); *Lokshin*, 980 F. Supp. at 114 ("[The] default itself could further be viewed as

evidence of willfulness."). *But see Langthorne*, 2001 WL 1609366, at *1 (inferring willfulness

from a defendant's default alone is "extremely problematic") (citing *Entertainment by J & J, Inc. v.

Perez*, 2000 WL 890819, at *2 (N.D. Cal. 2000) (holding that the mere assertion that a defaulted

defendant acted willfully was insufficient to justify enhanced damages)); *Kingivision Pay-Per-*

_____

divert cable service or satellite signals. . . .The illegality of any of these actions would have been apparent to the
perpetrator."); *Kingivision Pay-Per-View, Ltd. v. Recio*, 2003 WL 21383826, at *5 (S.D.N.Y. 2003) ("[T]he
defendants' actions were willful since they each took an affirmative action to illegally intercept [the] broadcast.");
*Kingivision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001) (finding willfulness
because "to access the telecast, it would have been necessary to use an unauthorized decoder, to illegally divert
cable service into the store, or improperly relocate an authorized decoder[,] . . . the illegality of [which] would have
been apparent to the perpetrator."); *Lokshin*, 980 F. Supp. at 114 (concluding defendant's "conduct undoubtedly
was willful since he took measures to purchase and install an unauthorized descrambler").

[14] In other words, the statute necessarily proscribes other types of conduct that are not "willful," or the
distinction is meaningless. An example of a possible non-willful violation would be a situation in which an adult
child gave a descrambler to his unsophisticated elderly parent and told the parent that he was paying all relevant
charges to the cable company. The parent would thus be unlawfully receiving cable transmissions, but under
circumstances that were not "willful."

*View, Ltd. v. Arias*, 2000 WL 20973, at *2 (N.D. Cal. 2000) (concluding that allegations of willfulness alone were insufficient to support finding of willfulness against defaulted defendant).

This Court does not agree that the act of defaulting is relevant to the willfulness finding. A finding that default is relevant implicitly suggests that the defendant is somehow contumaciously defying the plaintiff and the Court, similar to a criminal defendant who flees the jurisdiction rather than face prosecution. This view places far too much weight on an event that is nearly always ambiguous. There are many reasons why a defendant might default in a civil case—for example, because the defendant had moved away and the plaintiff could not locate him; because the defendant had no money for counsel and was not aware of his right to proceed *pro se*; or because the defendant did not speak English and did not understand the nature of the papers served upon him. Furthermore, unlike the flight of an accused criminal, a civil default imposes no particular hardship on the plaintiff or the Court. The plaintiff is not required to devote substantial resources to litigation, incurs no litigation risk, and generally obtains a very favorable judgment with little effort. Although plaintiff loses the opportunity to take discovery from the defendant, the availability of statutory damages makes that issue relatively insignificant. Also, while it is true that the plaintiff must find the defendant to enforce its default judgment, that is significant only where the defendant would be able to pay it; it seems highly probable that the great majority of defaulting defendants do not have meaningful assets with which to pay a judgment.

In any event, the Court finds that, under ordinary circumstances, the acts of purchasing a descrambler and installing it are sufficient, standing alone, to demonstrate willfulness. A descrambler has no legal use, and it would be unusual, to say the least, for a person to use such a

device non-willfully.  The allegations in the complaints therefore satisfy the first element of the standard for enhanced damages under 47 U.S.C. § 553(c)(3)(B).

### 2.    Private Financial Gain

The second element that must be established for enhanced damages is that the violation was committed "for purposes of commercial advantage or private financial gain."  47 U.S.C. § 553(c)(3)(B).  There is no issue in these cases of commercial advantage, so the question becomes whether the violations were committed for private financial gain.

Like the term "willful," the phrase "private financial gain" is not defined in § 553.  In pertinent part, § 553 provides:

> In any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages.

*Id.*  By way of comparison, an almost identical provision is found in § 605:

> In any case in which the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages.

47 U.S.C. § 605(e)(3)(C)(ii).  Section 605, however, goes on to restrict the term "private financial gain" as follows:

> [T]he term "private financial gain" *shall not include* the gain resulting to any individual for the private use in such individual's dwelling unit of any programming for which the individual has not obtained authorization for that use.

47 U.S.C. § 605(d)(5) (emphasis added).  Section 553, enacted after § 605, contains no such restriction.  It seems clear, as evidenced by the difference in the statutes, Congress intended to exclude from the definition of "private financial gain" the gain resulting from an individual's private

23

home use in § 605, but not in § 553.  As a consequence, the gain resulting from an individual's private home use *does* constitute "private financial gain" under § 553.

There is little case law discussing this point; what exists reveals two opposing views from the Eastern District of New York.

In *American Cablevision of Queens v. McGinn*, 817 F. Supp. 317, 320 (E.D.N.Y. 1993), the court declined to award enhanced damages where the defendant illegally modified his cable box on the grounds that such conduct did not constitute "private financial gain."  Although the court did not discuss the differences between §§ 553 and 605, the  court observed that anyone who uses a device to obtain cable illegally is reaping "private financial gain."  *Id.*  But the court reasoned that if this interpretation were correct, there would be no reason for a separate section to enhance damages for violations for "private financial gain," because all violations would be enhanced.  *Id.*; *see also Time Warner Cable of N.Y. v. Rivera*, 1995 WL 362429, at *4 (E.D.N.Y. 1995) (following *McGinn* in refusing to award enhanced damages for "private financial gain" where defendant tampered with her home cable box).

The court in *Lokshin,* by contrast, focused on the fact that § 605(d)(5) specifically excludes from the definition of "private financial gain" any unauthorized private home use, but § 553(c)(3)(B) contains no parallel exclusion.  980 F. Supp. at 112.  The court concluded that in the absence of such a qualification in § 553, the plain statutory meaning of "private financial gain" includes unauthorized private home use.  *Id.* at 114.  Accordingly, the court considered Lokshin's savings in cable fees to be "private financial gain" under § 553 and awarded enhanced damages.

*Id.* at 115; *see also Rosa*, 2002 WL 1446942, at *5 (awarding enhanced damages against a defendant for his unauthorized private use at home).[15]

The Court agrees with the reasoning of the *Lokshin* court. An individual's use of a descrambler to obtain cable programming without paying for it constitutes "private financial gain" within the meaning of the statute, absent unusual circumstances not apparently present here. The plain meaning of "private financial gain" and the fact that Congress excluded private home use from the definition of the phrase in § 605, but not § 553, both strongly support that conclusion.

That interpretation is potentially problematic only because it is so broad that many or most violations of § 553 would be subject to an award of enhanced damages. This result appears to be consistent with the statutory scheme, however. Because statutory damages should approximate actual damages with no deterrence premium, most, if not virtually all, violations *should* be subject to enhancement for deterrence purposes.[16]

Because both elements for enhanced damages have been established under § 553, the issue then becomes determining the amount of the award.

---

[15] The *McGinn* court had found that "private financial gain" under § 553 applies only when the defendant sells an illegal device or intercepts a signal for a public showing. 817 F. Supp at 320. The *Lokshin* court rejected that argument as inconsistent with the plain meaning of the statute, and similarly rejected the argument that such a reading of § 553 would subsume all conduct that violated the statute. 980 F. Supp at 114. The court provided two examples of violations of § 553 without "private financial gain": (1) an individual who assists in the installation of an unauthorized device, triggering § 553(a), but who does not receive any compensation, and (2) a manufacturer who attempts to distribute illegal cable theft devices but is apprehended before making its first sale. *Id.*

[16] For this interpretation to be completely coherent, there must exist a category of violations that are willful but not undertaken for either "commercial advantage" or "private financial gain." The *Lokshin* court provided two examples, set forth in footnote 14 above. A third possible example would be a person who purchases and installs a descrambler for the benefit of disabled children at an orphanage; the person has committed a willful violation, but presumably has obtained neither commercial advantage nor private financial gain from the transaction, only personal satisfaction.

### 3.    <u>Methodology for Determining Enhanced Damages</u>

The courts are also in disagreement as to how to determine the amount of any enhanced damages. Some courts have awarded minimal enhanced damages where the violation was relatively small in scale. *See*, *e.g.*, *Olmo,* 977 F. Supp at 590 (awarding $1,000 in enhanced damages for two offenses based on the small scale of the unauthorized modification scheme).[17] At the other extreme, some courts have awarded the maximum amount of enhanced damages where the defendant was in the business of selling descrambling devices. *See*, *e.g.*, *Time Warner Entm't/Advance-Newhouse P'ship v. Worldwide Elecs., L.C.*, 50 F. Supp. 2d 1288, 1301-02 (S.D. Fla. 1999) (awarding $50,000 in enhanced damages, the maximum under § 553, based on defendants' business of selling descrambling devices with full knowledge of its illegality).[18]

---

[17] Some courts have awarded relatively minimal enhanced damages even where there are multiple violations. *See*, *e.g.*, *Diaz,* 39 F. Supp. 2d at 125 (awarding $100,000 for defendants' willful sale of 750 illegal devices, or $133 for each violation, despite the fact that the maximum damages was $100,000 for each willful violation); *Lokshin*, 980 F. Supp. at 115 (awarding $1,500 in enhanced damages for a six-year violation where the services already received by defendant were near the statutory maximum).

[18] In *Entertainment by J & J, Inc. v. Friends II, Inc*, which involved the unauthorized interception and broadcast of a boxing match telecast by a bar, the court listed the following factors to be considered in awarding enhanced damages for willfulness: (1) repeated violations over time, (2) substantial monetary gains, (3) significant actual damages, (4) advertising for the stolen programming, and (5) charging a cover or a premium for drinks or food. 2003 WL 1990414, at *4 (S.D.N.Y. 2003). There, the court awarded $3,000 in enhanced damages for willfulness explaining that, although the defendants had charged a cover, there were only 35 patrons present and only two small televisions showing the match. *Id.*

But even where commercial establishments are involved, the amount of enhanced damages awarded varies considerably. *Compare Friends II* (awarding $3,000 for a single violation); *Recio*, 2003 WL 21383826, at *5 (awarding $2,000 for a single violation where defendant profited from selling food and drink); *Choquette,* 53 F. Supp. 2d at 113 (awarding $3,000 where free cable service was offered to tenants and the defendant therefore theoretically was able to charge them higher rent for this inclusion); *and Entertainment by J & J, Inc. v. Nina's Rest. & Catering*, 2002 WL 1000286, at *3 (S.D.N.Y. 2002) (awarding $2,500 for single violation), *with Jasper Grocery,* 152 F. Supp. 2d at 442 (awarding $10,000 despite lack of evidence of repeated violations or substantial monetary gains by the defendant), *and Pete,* 1999 WL 638215 at *2 (awarding $5,000 in for a single violation to deter future piracy of pay-per-view events even though defendant did not charge a cover and there were only 8 patrons present).

Overall, the amount of enhanced damages that have been awarded by the courts appears to be somewhat arbitrary and, for the most part, not based on any specific articulated factors. Courts obviously tend to award low enhanced damages for single violations by individual subscribers, but the amount awarded appears to be largely arbitrary. To maintain some semblance of consistency with the case law in this circuit, the Court will adopt the position that a $1,000 enhanced damages penalty is the presumptively correct amount for single violations by individual subscribers. *See Salinetti*, 148 F. Supp. 2d at 123 (adding $2,500 in enhanced damages where a club illegally exhibited a boxing match to patrons; concluding that such conduct was not particularly egregious); *Choquette*, 53 F. Supp. 2d at 113 (awarding enhanced damages of $3,000 where, over the course of several years, a landlord distributed illegally intercepted cable service to his tenants as part of their rent); *Pier House Inn*, 930 F. Supp. at 737 (enhancing damages by $5,000 where a hotel illegally intercepted cable service and blatantly advertised that it offered free cable in order to obtain a competitive advantage over other lodging places).

### D.    **Injunctive Relief**

Injunctive relief is available under § 553(c)(2)(A), which provides that the Court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1) of this section." Courts routinely enter injunctions preventing defendants from illegally intercepting cable. *See e.g.*, *Naranjo*, 303 F. Supp. 2d at 50. *But see Smith*, 141 F. Supp. 2d at 287-88 (refusing to issue injunction because plaintiff failed to establish irreparable harm and admitted to the court that it wanted an injunction so it could expose plaintiff to contempt sanctions). Accordingly, Charter will be granted statutory injunctive relief against each defendant here.

27

### E.    Costs

Section 553(c)(2)(C) authorizes the court in its discretion to "direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." In each of the cases before the Court, Charter has requested the costs of the filing fee and deputy sheriff's fee for service of the summons and complaint, as set forth in an attached affidavit. Accordingly, Charter will be awarded costs as follows: against Cintron, $198.94; against Sosa, $204.20; and against Burdulis, $204.20.

### F.    Attorneys' Fees

#### 1.    Methodology for Determining Attorneys' Fees

As noted, section 553(c)(2)(C) also authorizes the court in its discretion to award reasonable attorneys' fees to a prevailing party. "Given the burden borne by cable operators to protect and redress their statutory rights through civil actions from what is also criminal conduct," it is appropriate to award attorneys' fees in these cases. *Diaz*, 39 F. Supp. 2d at 126.

The First Circuit follows "the 'lodestar' approach, which calculates reasonable attorneys' fees as 'the number of hours reasonably expended multiplied by a reasonable hourly rate.'" *Naranjo*, 303 F. Supp. 2d at 50 (quoting *Furtado v. Bishop*, 635 F.2d 915, 920 (1st Cir. 1980)). A reasonable hourly rate is measured according to the prevailing market rates in the relevant community and by considering factors such as "'the type of work performed, who performed it, the expertise that is required, and when it was undertaken.'" *Choquette*, 53 F. Supp. 2d at 114 (quoting *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 951 (1st Cir. 1984)). To determine the number of hours reasonably spent, the Court must subtract from the number of hours actually spent "'hours which were duplicative, unproductive, excessive, or otherwise unnecessary.'" *Id.*

28

(quoting *Grendel's Den*, 749 F.2d at 950). This figure represents the lodestar; the Court may adjust the lodestar upward or downward to reflect other factors, including the result obtained. *Id.* at 114-15 (citing *Grendel's Den*, 749 F.2d at 951). "The First Circuit considers three meanings of the term 'results obtained': plaintiff's success on each claim, relief actually achieved, and the societal importance of the right which has been vindicated." *Id.* at 116.

At least two factors particular to these cases may affect the amount of attorneys' fees to be awarded from the amounts requested by plaintiffs.

First, it appears from the cases currently before the Court that Charter has filed multiple, largely identical lawsuits, corresponding to information it received from a raid on a distributor. Although counsel have filed nearly identical complaints, affidavits, and motions for each defendant, counsel have not specifically acknowledged the duplicative nature of the work in their billing. One would expect that the first case to be investigated, researched, and filed would bear the lion's share of the legal expenses, and that each additional similar case would involve substantially less effort by the attorneys. Counsel instead seeks largely identical fees for each case. It is not possible to tell from the record whether the time commitment has in fact been identical, whether the attorneys have attempted to allocate their legal fees to spread the cost of the litigation across all cases equally, or whether the fees otherwise have been adjusted.

Second, Charter requested relief under 47 U.S.C. § 605, which, as explained above, does not apply to cable piracy. The Court may consider this fact in assessing the result obtained in these cases and whether there should be a corresponding downward departure from the lodestar.

Nonetheless, Congress has clearly stated that successful plaintiffs are to be awarded their attorneys' fees. The Court recognizes that, given the relatively low damage awards involved in

29

cable-piracy cases, injured cable operators might not be inclined to vindicate their statutory rights if attorneys' fees were not available. Accordingly, the Court will grant Charter reasonable attorneys' fees in these cases, upon fulfillment of the conditions set forth below.

## 2.    Amount of Attorneys' Fees

Counsel for Charter have not provided the Court sufficient information with which to calculate reasonable awards of attorneys' fees in these cases. In particular, the Court requires further information about the allocation of legal expenses across largely identical lawsuits in multiple cases. Counsel should also identify what portion of the legal fees involved research or preparation of claims brought under 47 U.S.C. § 605 as opposed to § 553. Accordingly, counsel are directed to submit within 21 days a further sworn statement regarding attorneys' fees in these cases, at which time the Court will enter appropriate awards of attorneys' fees.

## Conclusion

Upon receipt and review of counsel's further statement regarding attorneys' fees, the Court will enter orders in the individual cases consistent with this memorandum, and judgment shall enter in favor of Charter.


/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: January 11, 2005