

ENRON OIL CORP. v. DIAKUHARA, 10 F.3d 90 (2nd Cir. 1993)

ENRON OIL CORP., ENRON INTERNATIONAL INCORPORATED, ENRON CORP., PLAINTIFFS-APPELLEES, v. MASONORI ("MIKE") DIAKUHARA, BULK OIL (U.S.A.), INC., BRIAN FRITH, ISLA PETROLEUM INC., CLIVE DC JOY-MORANCHO, AKIRA KIKUCHI, THOMAS N. MASTROENI, LOUIS J. BORGET, NICHIMEN CORPORATION, X-LINE ENTERPRISES, LTD., OMAC LIMITED, OMAC TRADING LIMITED, PETROPOL ENERGY, INC., RIGOIL (UK) LIMITED, RIGOIL, INC., ROANNE TRUST COMPANY (JERSEY) LIMITED, ROANNE TRUST CO., LTD., ROBERT L. SCHWEITZER, SOUTHWEST OIL & COMMODITIES, INC., ST. HELIER TRUST COMPANY LIMITED, TOMO PETROLEUM, INC., VIDEOGROUP, INC., DEFENDANTS, RONALD Z. FUCHS, DEFENDANT-APPELLANT.

No. 1626, Docket 92-9158.

United States Court of Appeals, Second Circuit.

Argued June 14, 1993.

Decided December 8, 1993.

Page 91

[EDITORS' NOTE: THIS PAGE CONTAINED HEADNOTES AND HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
Page 92

Raymond A. Connell, New York City (Connell Losquadro & Zerbo, of counsel), for defendant-appellant.

George A. Salter, New York City (Davis, Scott, Weber & Edwards, P.C., Gregory A. Markel, Orrick, Herrington & Sutcliffe, of counsel), for plaintiffs-appellees.

Appeal from the United States District Court for the Southern District of New York.

Before: CARDAMONE and MAHONEY, Circuit Judges, and PARKER, District Judge.[fn*]

[fn*] Honorable Fred I. Parker, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

CARDAMONE, Circuit Judge:

[1] Ronald Fuchs, a former trader in the petroleum market, appeals from a default judgment of the United States District Court for

the Southern District of New York (Edelstein, J.), entered October 8, 1992, that held him jointly and severally liable in damages with two co-defendants. Fuchs was at the time appearing *pro se* and failed to file an answer precisely within the time limits set by the Federal Rules of Civil Procedure. For this failure, the district court first entered a default against him and later a purported default judgment for more than $257 million. Fuchs contends the district court abused its discretion when, after ordering the entry of default under Federal Rule of Civil Procedure 55(a), but before entering default judgment under Rule 55(b)(2), it refused to set aside the default under Rule 55(c). We reverse because such extreme measures should be reserved by a trial court as a final, not a first, sanction imposed on a litigant.

[2]                          BACKGROUND

[3]                    A. *Underlying Fraud*

[4] Enron Corporation and its subsidiaries Enron Oil and Enron International (collectively, Enron or plaintiff) are Delaware corporations with their principal places of business in Houston, Texas. Enron is engaged in the business of trading petroleum and petroleum products. It hired Louis Borget in 1984 to oversee its oil trading activities and Thomas Mastroeni to maintain its trading accounts and books. At the same time, the firm established trading policies and limits designed to restrict its market exposure and to protect it from large trading losses.

[5] Beginning in 1985, according to the complaint Enron filed, Borget and Mastroeni — acting in concert with others — defrauded and stole from Enron by entering into a series of trades exceeding Enron's internal trading limits. Plaintiff alleges that by the time this multifarious scheme came to light in October 1987, Borget and Mastroeni had misappropriated $5.9 million from the firm. Enron asserts that Borget and Mastroeni also left it with open positions on the market that the firm was required to cover at a cost to it of an additional $142 million.

[6] Plaintiff further alleges that as part of their fraudulent plan Borget and Mastroeni actively deceived Enron's independent auditors. For example, in March 1987, realizing that an inspection of Enron's open market positions was scheduled, they instructed Enron oil trader Robin Eves to enter into four separate contracts to sell one million barrels of unleaded gasoline to the Bulk Oil Company, and at the same time to enter an agreement with Bulk Oil that these four contracts would never be executed. Eves undertook these transactions with Bulk Oil's executive vice president, defendant Ronald Fuchs, on
Page 93
March 13, 1987. The purported transfers — which Enron now insists Fuchs knew were sham contracts — effectively camouflaged from its financial examiners Enron's actual trading position.

[7] Fuchs responds that he thought the transactions proposed by Eves were typical "rollover" deals. In any event, he continues, since the dollar amount involved was outside of his trading authority, he brought the proposal to the attention of Bulk Oil's president, Jacob Schreiber, who approved the contracts as a

routine transaction. When Enron then failed to confirm its end of
the arrangement, Schreiber told Fuchs to cancel the contracts,
which was done. Fuchs avers that he never spoke with anyone at
Enron other than Eves, and had no knowledge that the aborted
transactions were outside Enron's trading limits or designed to
evade its auditors' inspection.

[8]                           B. *Proceedings Below*

[9] On April 21, 1988 Enron filed a complaint in the Southern
District of New York alleging various violations of the Racketeer
Influenced and Corrupt Organizations Act (RICO), breaches of
fiduciary duty, fraud, and fraudulent conveyances. It named as
defendants Borget and Mastroeni, and several others, including
Bulk Oil and Ronald Fuchs. Fuchs was personally served on April
22, 1988 and appeared then by counsel.

[10] On July 22, 1988 plaintiff filed an amended complaint that was
personally served on Fuchs' counsel. All the defendants were
given until August 1, 1988 to respond to the amended complaint.
On that date, Fuchs and Bulk Oil filed a motion pursuant to Fed.
R.Civ.P. 12(b)(6) to dismiss plaintiff's complaint for failure to
state a cause of action. Other defendants made the same motion
and various parties made discovery requests. On September 1, 1988
Enron filed papers in opposition to Bulk Oil and Fuchs' Rule
12(b)(6) motion.

[11] Fuchs' attorney thereafter notified the district judge that he
could not continue to represent Fuchs because Fuchs was unable to
pay counsel fees. In an order and stipulation dated October 23,
1989 the district court relieved counsel and noted that defendant
would appear thereafter as a *pro se* litigant. In December 1989
Bulk Oil filed a petition for protection under the bankruptcy
laws, staying further proceedings against the oil company. *See*
11 U.S.C. § 362 (1988).

[12] A court conference was held on January 25, 1990 to resolve
discovery disputes. At the conference plaintiff successfully
sought leave to file a second amended complaint. The district
court deferred decision on defendants' outstanding motions to
dismiss the first amended complaint, stating it had reviewed the
parties' motions with respect to the earlier complaint, and "if
the defendants are contemplating similar or duplicative motions
on the [second] amended complaint, I will be very much
displeased."

[13] Enron filed its second amended complaint on March 26, 1990,
serving a copy on Fuchs by regular mail. The allegations
concerning Fuchs' role in the alleged fraud in the second amended
complaint were substantially the same as those in the first
amended complaint. On April 9, 1990 — referring specifically to
"all papers filed on August 1, 1988 in support of the motion to
dismiss the first amended complaint" — two defendants, not
including Fuchs, moved to dismiss the second amended complaint.
After several months of active discovery, plaintiff settled with
a number of the defendants, who were then dismissed from the
case. As of May 1991 plaintiff had outstanding claims only
against defendants Fuchs, Borget, and Mastroeni — each of whom
had failed to answer Enron's second amended complaint.

[14] On April 24, 1991 Fuchs sent a letter to the district court, with a copy to plaintiff, informing it that Enron's second amended complaint "was not served to me." Fuchs also wrote, "I received information that the court had found me in default and if this is true, I ask that Your Honor would vacate any Order based on Enron's Application." A week later, on May 2, Enron responded to Fuchs' letter by stating, "Plaintiffs have not filed an application for default judgment. . . . Mr. Fuchs is also wrong about not being served with the Second Amended Complaint; he was served by mail on March 26, 1990."
Page 94

[15] On June 3, 1991 Enron applied for an order directing the clerk of the court to enter defaults under Fed.R.Civ.P. 55(a), and for default judgments under Fed.R.Civ.P. 55(b)(2), against defendants Fuchs, Mastroeni, and Borget. It served a notice of this default application on Fuchs by hand, and informed him that the application would be made before the court on June 11, 1991. Plaintiff's counsel provided an affidavit in support of its application in which it stated that, despite Fuchs' claims to the contrary, he had in fact been served by mail with the second amended complaint, and that he had been served personally with the original complaint.

[16] In answer to Enron's default application, Fuchs sent a hand-delivered letter to Enron on June 5, 1991 with a copy to the district court. Fuchs repeated his previous assertion that he had never been served with the second amended complaint and argued that therefore he could not be in default. Fuchs continued: "I believe that rather than arguing back and forth and wasting court time with motions for default, it would be more helpful if you could send to me Enron's Second Amended Complaint. . . ." Plaintiff complied with this request by delivering a copy of the second amended complaint to Fuchs on June 10, 1991.

[17] In a letter to the district court dated June 11 -- the following day -- Fuchs made a motion that Enron's default request be denied. In a supporting affidavit, he affirmed: "It is only today, June 10th, 1991, that I have received from Enron's attorneys their Second Amended Complaint. . . . I confirm its acceptance and will reply it [sic] shortly." There is some question as to when, if ever, the district court received Fuchs' letter and affidavit. Although Fuchs states the correspondence was sent to the district court and Enron on June 11, the docket sheet does not reflect the receipt of these papers.

[18] Apparently without the benefit of Fuchs' response to Enron's papers seeking a default, the district court filed a default order directing that default judgment be entered against Fuchs, Mastroeni, and Borget on June 11, 1991. Its stated reason for doing so was because these parties had failed to answer the second amended complaint. The district court then referred the case to a magistrate judge for an assessment of damages. On June 18 plaintiff sent Fuchs a copy of the district court's default order, to which defendant replied on the same day. He noted: "It seems to me that your honor has reviewed and signed Enron's motion prior to the court receiving my Application [of June 11 to reject default judgment]." Fuchs then requested either that his

application be considered or that he be granted a hearing on the
issue of vacating the default.

[19] The trial court treated Fuchs' letter as a motion to set aside
the entry of default under Fed.R.Civ.P. 55(c) and, in an order
dated June 21, 1991, denied it stating in part,

> WHEREAS Fuchs was personally served with plaintiffs'
> application for the default judgment on June 3, 1991,
> said motion returnable on June 11, 1991; and

> WHEREAS by Fed.R.Civ.Pro. 6(d), any opposing
> affidavit to the application for the default had to
> be filed no later than June 10, 1991; and

> WHEREAS Fuchs made no such timely filing; and

> IT IS HEREBY ORDERED that Fuchs' petition to vacate
> the default judgment is denied.

[20] On June 25, 1991 Fuchs took an appeal, which we dismissed on
August 5 because the district court's order was not final. The
matter then proceeded before the magistrate judge for a
calculation of damages.

[21] On August 16, 1991 Enron submitted to that court proposed
findings of fact and conclusions of law with respect to damages.
Fuchs responded with an affidavit dated September 30, 1991 in
which he denied any wrongdoing. On October 31, 1991 the
magistrate judge recommended to the district court that damages
be assessed against Fuchs and the two other defaulting
defendants, Mastroeni and Borget, in the amount of approximately
$85.7 million, which when trebled under RICO amounted to a
default judgment in excess of $257.3 million for plaintiff.

[22] On November 19, 1991 Fuchs retained current counsel to
represent him in the instant litigation. One day later, with the
assistance
Page 95
of counsel, Fuchs filed an objection to the magistrate judge's
report. The district court found these objections to be "without
merit" and accepted the report in its entirety. It accordingly
held Fuchs, Borget, and Mastroeni jointly and severally liable to
Enron for the full $257,399,991. Final judgment against Fuchs and
his co-defendants was entered on October 8, 1992. This appeal
followed.

[23]                          DISCUSSION

[24] Fuchs' principal contention on appeal is that the district
court erred in denying his June 18, 1991 *pro se* motion to
vacate the entry of default under Fed.R.Civ.P. 55(c). He argues
in the alternative that the default judgment should have been
vacated due to the failure of Enron's second amended complaint to
contain well-pleaded allegations of fact establishing his
liability. Because we think it was an abuse of discretion for the
district court to refuse to set aside the default, we need not
decide Fuchs' alternative argument.

[25]                      I General Principles

[26]  A. *Procedural Rules for Entry of Default and Default Judgment*

[27] We begin analysis by tracing the procedures established by Rule 55 for the entry of default and the entry of a default judgment. Rule 55(a) states that a clerk may enter a default upon being advised by affidavit or otherwise that a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend. The clerk's record should contain a notation to that effect. Fed.R.Civ.P. 55(a). Rule 55(b)(1) and Rule 55(b)(2) provide that judgment by default be entered as follows: The clerk may enter a judgment when the claim is one for a sum certain, if furnished with an affidavit of the amount due, and provided that defendant has been defaulted for failure to appear. *See* Fed.R.Civ.P. 55(b)(1). In any other case, other than a sum certain, application must be made to the court for a default judgment. The defendant, if he or she has appeared, is entitled to three days written notice prior to the hearing on such application. *See* Fed.R.Civ.P. 55(b)(2). If in order to enter a default judgment the amount of damages must be ascertained, the court may conduct a hearing or order a reference. *Id.*

[28] The entry of default is an interlocutory act and, as such, a non-final order. It is therefore not appealable, as the procedural history of this case illustrates. A default judgment is a final action by the district court in the litigation — one that may be appealed. In an appeal from a default judgment, the court may review both the interlocutory entry of default and the final judgment. *See Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 335-36 (2d Cir. 1986).

[29] After default or a default judgment has been entered, Rule 55(c) grants a litigant the right to petition to set either aside. *See* 10 Charles A. Wright et al., *Federal Practice and Procedure* § 2692, at 464 (2d ed. 1983). A party may move pursuant to Rule 55(c) to set aside the entry of default for "good cause" or to set aside a default judgment in accordance with Rule 60(b). Fed.R.Civ.P. 55(c).

[30] The dispositions of motions for entries of defaults and default judgments and relief from the same under Rule 55(c) are left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties. *See Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 507 (2d Cir. 1991), *cert. denied*, ___ U.S. ___, 112 S.Ct. 1763, 118 L.Ed.2d 425 (1992); *Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir. 1983). Such discretion is nonetheless not unlimited; we have reversed its exercise, even where the abuse was not glaring. *See Davis v. Musler*, 713 F.2d at 907, 913 (2d Cir. 1983); *Traguth*, 710 F.2d at 94; *accord Bridoux v. Eastern Air Lines, Inc.*, 214 F.2d 207, 210 (D.C.Cir.), *cert. denied*, 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647 (1954).

[31] The circumscribed scope of the district court's discretion in the context of a default is a reflection of our oft-stated preference for resolving disputes on the merits. *See Traguth*, 710 F.2d at 94; *Meehan v. Snow*, 652 F.2d 274, 277 (2d

Cir. 1981). We
Page 96
recognize the tension that exists between the push on a trial
court to dispose of cases that, in disregard of the rules, are
not processed expeditiously, which cases delay and clog its
calendar, on the one hand; and the strong pull on the same trial
judge to do justice in the individual case, on the other hand.
But an understandable zeal for a tidy, reduced calendar of cases
should not overcome a court's duty to do justice in the
particular case. It is the responsibility of the trial court to
maintain a balance between clearing its calendar and affording
litigants a reasonable chance to be heard. *See Merker v. Rice,*
649 F.2d 171, 174 (2d Cir. 1981); *See also Gill v. Stolow,*
240 F.2d 669, 670 (2d Cir. 1957) ("general principles cannot
justify denial of a party's fair day in court except upon a
serious showing of willful default").

[32] Default procedures, of course, provide a useful remedy when a
litigant is confronted by an obstructionist adversary. Under such
circumstances those procedural rules play a constructive role in
maintaining the orderly and efficient administration of justice.
*See* Wright et al., *supra,* § 2693, at 477-79. Yet, because
defaults are generally disfavored and are reserved for rare
occasions, when doubt exists as to whether a default should be
granted or vacated, the doubt should be resolved in favor of the
defaulting party. In other words, "good cause" and the criteria
of the Rule 60(b) set aside should be construed generously. *See,
e.g., Davis,* 713 F.2d at 915; *Meehan,* 652 F.2d at 277; 6 James
W. Moore et al., *Moore's Federal Practice* ¶ 55.10[1], at 79 (2d
ed. 1993).

[33]        B. *Substantive Rules for Set Aside for the Same*

[34] With these general principles in mind, we turn to the
substantive rules for setting aside a default or default judgment
under Rule 55(c). Rule 55(c) provides: "For good cause shown the
court may set aside an entry of default and, if a judgment by
default has been entered, may likewise set it aside in accordance
with Rule 60(b)." Fed.R.Civ.P. 55(c). Because Rule 55(c) does not
define the term "good cause," we have established three criteria
that must be assessed in order to decide whether to relieve a
party from default or from a default judgment. These widely
accepted factors are: (1) whether the default was willful; (2)
whether setting aside the default would prejudice the adversary;
and (3) whether a meritorious defense is presented. *See, e.g.,
Action S.A.,* 951 F.2d at 507; *In re Men's Sportswear, Inc.,*
834 F.2d 1134, 1138 (2d Cir. 1987); *Meehan,* 652 F.2d at 277.
Other relevant equitable factors may also be considered, for
instance, whether the failure to follow a rule of procedure was a
mistake made in good faith and whether the entry of default would
bring about a harsh or unfair result. *See Sony Corp. v. Elm
State Elecs., Inc.,* 800 F.2d 317, 320 (2d Cir. 1986). Although
the factors examined in deciding whether to set aside a default
or a default judgment are the same, courts apply the factors more
rigorously in the case of a default judgment, *see, e.g.,
Meehan,* 652 F.2d at 276, because the concepts of finality and
litigation repose are more deeply implicated in the latter
action.

[35] Further, concerns regarding the protection of a litigant's rights are heightened when the party held in default appears *pro se*. A party appearing without counsel is afforded extra leeway in meeting the procedural rules governing litigation, and trial judges must make some effort to protect a party so appearing from waiving a right to be heard because of his or her lack of legal knowledge. *See Traguth*, 710 F.2d at 95; *see also Haines* v. *Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) (per curiam) (allegations of *pro se* complaint are held to less stringent standard than formal pleading drafted by lawyers, when court considers a motion to dismiss). Hence, as a general rule a district court should grant a default judgment sparingly and grant leave to set aside the entry of default freely when the defaulting party is appearing *pro se*.

[36] Finally, the importance of an explanation by the district court for its denial of a motion to vacate in light of these criteria is self-evident. The absence of an explanation defeats intelligent appellate review. *See, e.g., Marziliano v. Heckler*, 728 F.2d 151, 156 (2d Cir. 1984); *Davis*, 713 F.2d at 913. While the failure of a district judge to provide an explanation is not always fatal — so long as it is possible to discern that the appropriate criteria have been satisfied, *see Marziliano*, 728 F.2d at 156; *Standard Newspapers, Inc.*
Page 97
v. *King*, 375 F.2d 115, 116 (2d Cir. 1967) (per curiam) — it remains true that a trial court should provide specific reasons for a denial of a motion to set aside a default under Rule 55(c).

[37]                    II Substantive Principles Applied

[38] We turn now to consider the application of these general principles to the case at hand. At the outset, we believe the district court's June 11 order directing that a default judgment be entered against Fuchs was improper. The docket entries show that plaintiff moved for the entry of a default and a default judgment on June 3, 1991 and made the application returnable on June 11. On June 11, 1991 the district court entered a default judgment against defendant Fuchs. This order was improper because a default judgment cannot be entered until the amount of damages has been ascertained. Here, the district court ordered entry of such a judgment in the same order in which it referred the case to the magistrate judge to compute damages. Thus, the default judgment was not valid when entered on June 11, 1991 because at that time the district court only had the authority to order an entry of default.

[39] Treating the June 11 order as an order for entry of default, we now turn to assess the substantive issues involved in the entry of default to determine whether they meet the good cause criteria. We first note that the district court was not faced with a defendant who failed to appear or defend the action against him. Not only did Fuchs respond to plaintiff's first amended complaint with a motion to dismiss, but he also participated with plaintiff in discovery. Although he did not file a motion to dismiss the second amended complaint, his original motion to dismiss was responsive to the second amended complaint, as the amended charges did not substantially alter the original allegations made against him. Moreover, upon granting

leave to file the second amended complaint, the district court
specifically stated that it would hold the pending motions to
dismiss — including defendant Fuchs' motion — in abeyance and
actively discouraged the submission of further motions to
dismiss. Under these circumstances an entry of default is in
itself a dubious action.

[40] We need not decide on this basis, though, because we find that
the district court abused its discretion in refusing to set aside
the entry of default under Rule 55(c). In its order of June 21,
1991 the district court summarily dismissed Fuchs' motion to
vacate the entry of default because he failed to make a timely
filing. The order does not set forth the "good cause" factors the
district court is required to consider when ruling upon a Rule
55(c) motion. Nor does the order address Fuchs' explanation for
not answering the second amended complaint. There is no
indication that the trial court carefully studied the matter as
called for by *Davis* and *Standard Newspapers*. Moreover, the
record on appeal does not make readily apparent the reasons why
the district judge denied the motion to set aside the default.

[41] In refusing to set aside the entry of default solely on the
basis of Fuchs' untimely response to Enron's default application,
the district court also failed to consider other important
circumstances. It did not acknowledge, for example, Fuchs' then
status as a *pro se* litigant, or that his opposition papers were
filed only a day or so late, and his affidavit was signed on the
same day he asserted that he finally received a copy of the
second amended complaint, after twice indicating that he had
never been served. *See Traguth*, 710 F.2d at 95. Further,
defaults, as earlier explained, are particularly disfavored by
the law when substantial rights are implicated, *see, e.g.*,
*Klapprott v. United States*, 335 U.S. 601, 611-12, 69 S.Ct. 384,
388-89, 93 L.Ed. 266 (1949), or when substantial sums of money
are demanded, *see Sony Corp.*, 800 F.2d at 320 (listing cases
holding that default disfavored when large sums of money are
involved). Here the mitigating factor of the large $257.3 million
money judgment obtained by plaintiff because of defendant's
default was not discussed. Hence, the record makes plain that had
the proper "good cause" standard been applied, the court should
have set aside the entry of default.

[42]                    A. *Willfulness of Default*

[43] This is not a case of a willful default or a refusal to proffer
an excuse for not responding. Fuchs' conduct and *pro se*
correspondence
Page 98
evidences his intent to fulfill his obligations as a litigant. He
initially retained counsel and filed a timely motion under Rule
12(b)(6) to dismiss plaintiff's first amended complaint. Two
months before the entry of default, he informed plaintiff's
counsel and the district court that he had not received Enron's
second amended complaint. Whether the defendant did or did not
receive the second amended complaint in March of 1990 is
disputed; what is clear is that under the case law all doubts
must be resolved in favor of trial on the merits. *See Sony
Corp.*, 800 F.2d at 320; *cf. Camp v. Guercio*, 464 F.Supp. 343,
346 (W.D.Pa. 1979) (judgment of default for failure to file

timely answer could not be entered when evidence was conflicting
as to whether service of amended complaint was ever
accomplished).

[44] Thus, assuming that Fuchs did not receive the second amended
complaint, there could be no "willfulness" in his failure to
answer that pleading. When he finally received a copy of this
pleading, along with Enron's motion for entry of default, he
responded immediately, making clear that he was not willing to
forfeit his rights. Again, when the court entered a default
against him, Fuchs assumed that it had done so without reading
his June 11 letter and affidavit, and promptly applied for a
motion to set aside the entry. Unlike the defendant in *Action
S.A.*, 951 F.2d at 507, who deliberately chose not to appear in
an action, Fuchs made a good faith effort to adhere to the rules
of the court and to protect his rights, and therefore did not
willfully default.

[45]                    B. *Prejudice to Plaintiff*

[46] Setting aside the entry of default will not prejudice Enron.
Plaintiff has argued on appeal that it would be unfair to require
it to re-commence litigation years after these transactions
occurred because the passage of time will impair its ability to
prosecute. Concededly, the result we reach will cause plaintiff
some delay. But delay standing alone does not establish
prejudice. *Cf. Davis*, 713 F.2d at 916 (when vacating a default
judgment, "delay alone is not a sufficient basis for establishing
prejudice"). Additionally, though Fuchs was required under
Fed.R.Civ.P. 15(a) to respond within ten days after Enron filed
its second amended complaint on March 26, 1990, Enron did not
file its notice of application for entry of default until June 3,
1991. The fact that plaintiff waited over a year before seeking
such relief strongly suggests that some further delay will not
unduly prejudice it. Enron asserts no other sort of prejudice.

[47]                    C. *Meritorious Defense*

[48] Finally, Fuchs has proffered a meritorious defense. A defendant
seeking to vacate an entry of default must present some evidence
beyond conclusory denials to support his defense. *See, e.g.,
Sony Corp.*, 800 F.2d at 320-21. The test of such a defense is
measured not by whether there is a likelihood that it will carry
the day, but whether the evidence submitted, if proven at trial,
would constitute a complete defense. *See Keegel v. Key West &
Caribbean Trading Co.*, 627 F.2d 372, 374 (D.C.Cir. 1980); *See
also Davis*, 713 F.2d at 916. More than sufficient evidence of a
complete defense is found in this record.

[49] Fuchs states in his affidavit that he was not aware of Enron's
financial condition or its trading limits and did not know that
his transactions with Bulk Oil were designed by it to evade its
auditors' detection. Enron's own trader, Robin Eves, confirmed
that Fuchs had no reason to know that the March 13, 1987 gasoline
transactions between Bulk Oil and Enron were illicit. The proof
set forth in Fuchs' original motion to dismiss, his subsequent
affidavits, and the deposition testimony of Robin Eves adequately
stated a defense for purposes of a Rule 55(c) set aside of an
entry of default. *See Meehan*, 652 F.2d at 277.

[50]                          CONCLUSION

[51] Thus, we hold the district court should have assessed Fuchs'
Rule 55(c) motion in terms of the established "good cause"
criteria and the other relevant factors. Had it done so it would
have granted defendant's motion to set aside the entry of
default. Its failure to do so was an abuse of discretion.
Consequently, the judgment appealed from is reversed and the case
is remanded to the district court for further proceedings on the
merits.

Page 925

Copyright © 2004 Loislaw.com, Inc. All Rights Reserved



# MURTHA CULLINA LLP

A T T O R N E Y S    A T    L A W

99 HIGH STREET
BOSTON, MASSACHUSETTS 02110-2320

TELEPHONE (617) 457-4000
FACSIMILE (617) 482-3868
www.murthalaw.com

June 2, 2004

Ines Cintron
44 Roosevelt Drive
Southbridge, MA 01550

> Re: *Charter Communications Entertainment I, LLC d/b/a*
> *Charter Communications v. Ines Cintron*
> Civil Action No. 04-40064-NMG

Dear Ms. Cintron:

Enclosed please find a copy of your invoice from Modern Electronics that you requested.

Very truly yours,

Madeleine Kane

Madeleine P. Kane
Paralegal

/mpk
Enclosures

279388-1

**Modern Electronics, Inc.**
2609 So. 156 Circle
Omaha, NE 68130
(402) 334-3523

| | |
|---|---|
| Invoice No. | 88167 |
| Customer No. | 43744 |
| Order Date | 4/25/00 |
| Sales Id: | PF |

| Bill To: | Ship To: |
|---|---|
| INES CINTRON<br>54 GRACE LANE<br><br>SOUTH BRIDGE, MA 01550 | INES CINTRON<br>54 GRACE LANE<br><br>SOUTH BRIDGE, MA 01550 |

| | |
|---|---|
| Ship Destination: | Residential |
| Ship Type: | UPS Ground Service |
| Ship Instr: | |
| Payment Type: | C.O.D. |
| Customer Phone#: | HOME:(508) 765-0163 |

| Item | Description | Qty | Price | Total |
|---|---|---|---|---|
| BOSSV | BOSSV | 1 | $225.00 | $225.00 |
| SP | SURGE PROTECTOR | 1 | $19.00 | $19.00 |

| | |
|---|---|
| Item Subtotal | $244.00 |
| Shipping/Handling Fee | $12.00 |
| COD/Processing Fee | $5.00 |
| Invoice Subtotal | $261.00 |
| | |
| Invoice Total | $261.00 |







Refund Amount applies to product price only.
Shipping/Handling and Processing Fees are non-refundable.

# MODERN ELECTRONICS

Customer No. _____ Date _4·25_

Home Phone _508 765 0163_ Sales Person _RA_

Work Phone _____ R _X_ C ____

Ship To
Company Name _____

Name _Ines Cintron_

Address _54 Grace Ln_ # _____

City _South Bridge_ State _MA_ Zip Code _01550_

Bill To _____

Address _____ Apt # _____

City _____ State _____ Zip Code _____

Used in Zip Code _01550_ Heard about us? _Friend_

Cable Company _Charter_

Make/Model _8590_

| ITEM | PRODUCT | CHANNEL | QTY. | PRICE | TOTAL |
|------|---------|---------|------|-------|-------|
|  | Boss 5 |  | 1 | 225 | 225 |
|  | S.P. |  | 1 | 19 | 19 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**Shipping Method**  ☐ US Mail  ☐ Other _____

☑ UPS Ground  ☐ UPS 1-Day  ☐ UPS 2-Day  ☐ UPS 3-Day

**Method of Payment**  ☐ Mastercard  ☐ Visa

☐ American Express  ☐ Discover  ☐ C.O.D.

| | |
|---|---|
| Subtotal | 244 |
| Shipping | 12 |
| C.O.D. Add $5.00 | 5 |
| Total | 261 |

Name On Credit Card

Credit Card #

Exp. Date | Bank Phone No.



Final Request

## SOCIAL SECURITY ADMINISTRATION

**Claim Number:** 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

1500 WOODLAWN DRIVE
BALTIMORE, MD 21241
Office Hours:
Telephone: (800) 772-1212

INES CINTRON
PO BOX 591
SOUTHBRIDGE, MA 01550-0591

DATE:  JAN  1  2  2005

We are writing to you because we need to know more about your work. We need this information to help us decide if you still qualify for benefits.

On 10/01/2004 we sent you a Work Activity Report to complete and return to us. We have not yet received that report.

We are sending you another copy of the form. Please complete it and mail it back to us within the next 15 days. We have enclosed an envelope for you to use. If for some reason the envelope is not with the letter, please send the form to us at the address shown above.

The enclosed pamphlet, "Working While Disabled...How Social Security Can Help", will tell you more about why we need to know about your work.

### If We Do Not Hear From You

If we do not hear from you within the next 15 days, we may contact your employer(s) for the information we need. Or, we will make a decision based on the information we have. When we make our decision, we will send you another letter. That letter will tell you what to do if you disagree with our decision.

### If You Have Any Questions

If you have any questions, call us toll-free at 1-800-772-1213 or call your local Social Security office at (508) 753-4105. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
51 MYRTLE ST
MADISON PLACE
WORCESTER, MA 01608

Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly.

W. BURNELL HURT
ASSOCIATE COMMISSIONER

Enclosure
SSA Pub No. 05-10095
Pre-addressed Envelope

Form **SSA-822-BK** (03-2001)
EF (03-2001)

**Claim Number: 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**

### Work and Earning Summary

The following information is being provided to assist you in completing the enclosed Work Activity Report. It shows any employers and yearly earnings we currently have for you on record.

Earnings information is not available for work you did this year and will likely not be shown for any work you did last year. If you have worked any other places not shown on the enclosed Work Activity Report, please provide information on a separate piece of paper.

| Employer | Year | Yearly Earnings |
|---|---|---|
| ENDICOTT & COLBY TEMPORARIES INC | 2001 | $516.15 |
| TWIN COAST ENTERPRISES INC | 2001 | $5,685.36 |
| | 2002 | $11,972.24 |
| | 2003 | $9,333.09 |

9. More space. If you need more space to answer the questions or for more space, use space below. Remember to write the number of the question that you are answering before you begin.

I HAVE NOT
WORKED SINCE 1999.
I NEVER WORKE IN
2001 2002 + 2003
FOR TWIN COAST ENTERPRISES.
I BELIEVE SOMEONE IS
USING MY S.S. NUMBER
THES EARNINGS SHOULD BE
DELETED FROM MY RECORD.

10. I authorize any employer, agency or other organization to disclose to the Social Security Administration or the State agency that may determine or review my entitlement to disability benefits any information about my medical condition or my work.

### SIGN AND DATE THIS FORM

**ANYONE MAKING A FALSE STATEMENT OR REPRESENTATION OF A MATERIAL FACT FOR USE IN DETERMINING A RIGHT TO PAYMENT UNDER THE SOCIAL SECURITY ACT COMMITS A CRIME PUNISHABLE UNDER FEDERAL LAW.**

| Signature of Claimant, Beneficiary or Representative | Date | Telephone Number *(Include area code & e-mail address)* |
|---|---|---|
| Ines Cintron | 10-21-04 | 508 765-0667 |

Mailing Address (Number and Street)

PO Box 591

| City and State | Zip Code | County |
|---|---|---|
| SOUTHBRIDGE MA | 01550 | |

Witnesses must sign ONLY if this statement is signed by mark (e.g., X) above. If signed by mark (X), two witnesses to the signing who know the person making the statement must sign below, giving their full addresses and telephone numbers.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address *(Number, Street, State, & Zip Code)* | Address *(Number, Street, State, & Zip Code)* |
| Telephone Number *(Include Area Code)* | Telephone Number *(Include Area Code)* |

Form **SSA-821-BK** (03-2001) (EF 03-2001) Formerly SSA-821-F4 & SSA-3945-BK  6

**SOCIAL SECURITY ADMINISTRATION**

**Claim Number:** 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 A

1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Phone:   1-800-772-1213
Fax:

Date:

INES CINTRON
PO BOX 591
SOUTHBRIDGE MA  01550-0591

We are writing to you because we need to know more about your work.

The enclosed pamphlet, "Working While Disabled...How Social Security Can Help", will tell you more about why we need to know about your work.

**What You Need To Do**

The enclosed form asks for facts we need to know.  Please sign, date, and return the completed form within 15 days.  We have enclosed an envelope for you to use.

**If You Have Any Questions**

If you have any questions, please let us know.  You may also call, write, or visit any Social Security office.  If you do contact an office, please have this letter with you.  It will help us answer your questions.

Wendell F. McCaden
Benefits Earnings Technican

Enclosure
SSA Pub. No. 05-10095
Pre-addressed Envelope

Form **SSA-821-BK**  (03-2001)
EF (03-2001)

## Work and Earning Summary

The following information is being provided to assist you in completing the enclosed Work Activity Report. It shows any employers and yearly earnings we currently have for you on record.

Earnings information is not available for work you did this year and will likely not be shown for any work you did last year. If you have worked any other places not shown on the enclosed Work Activity Report, please provide information on a separate piece of paper.

| YEAR | 2001 | Employer | Yearly Earnings |
|------|------|----------|-----------------|
| | | TWIN COAST ENTERPRISES INC | $5,685.36 |
| | | ENDICOTT & COLBY TEMPORARIES INC | $516.15 |
| YEAR | 2002 | Employer | Yearly Earnings |
| | | TWIN COAST ENTERPRISES INC | $11,972.24 |
| YEAR | 2003 | Employer | Yearly Earnings |
| | | TWIN COAST ENTERPRISES INC | $9,333.09 |

$ 27,506.84

515-2609